Bugliotti v. Republic of Argentina

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

_____

August Term, 2019

(Argued: January 15, 2020     Decided: March 17, 2020)

Docket No. 19-379

_____

EUCLIDES BARTOLOME BUGLIOTTI, MARIA CRISTINA DE BIASI, ROXANA INES ROJAS, AS EXECUTOR OF THE ESTATE OF HUGO MIGUEL LAURET,

*Plaintiffs-Appellants*,

—v.—

REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

_____

B e f o r e :

KATZMANN, *Chief Judge*, HALL and LYNCH, *Circuit Judges*.

_____

Plaintiffs — subscribers to the Republic of Argentina's 1994 sovereign debt offering —enrolled their bonds in a governmental tax-credit program just prior to Argentina's 2001 default on the bonds. Pursuant to that program, Plaintiffs placed their bonds into trust and received certificates representing principal and

interest amounts, respectively. Plaintiffs have now redeemed each of the interest-based certificates for a corresponding tax credit; meanwhile, although the bonds have all reached their respective maturity dates, Argentina has continued to withhold the principal, which Plaintiffs have sued to recover. The United States District Court for the Southern District of New York (Preska, *J.*) dismissed their complaint on multiple alternative grounds, including foreign sovereign immunity and failure to state a claim. Central to each of those grounds for dismissal was the district court's holding that Plaintiffs no longer "owned" the bonds themselves as a matter of Argentine trust law. The decisive question at this stage, however, is not whether Plaintiffs "own" the bonds; instead, it is whether Plaintiffs retain the specific right to sue to enforce them. Because answering that question may involve an inquiry into Argentine law that the district court did not conduct, we remand so that it may do so in the first instance. AFFIRMED in part, VACATED in part, and REMANDED.

—————————

MICHAEL C. SPENCER, Milberg Tadler Phillips Grossman, LLP, New York, NY, *for Plaintiffs-Appellants*.

RAHUL MUKHI (Carmine D. Boccuzzi, Jr., *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendant-Appellee*.

—————————

PER CURIAM:

Plaintiffs brought this action to recover unpaid principal amounts of defaulted Argentine sovereign debt. This Court has confronted a multitude of similar claims before; Plaintiffs' claim is unusual, however, because of their participation in an Argentine governmental program that resulted in Plaintiffs' bonds being held in trust for their benefit. The district court held that under Argentine trust law, Plaintiffs no longer "own" the bonds whose principal

2

amounts they seek to recover. And, because those bonds contain the contractual waivers that make it possible for Plaintiffs to sue Argentina in a United States court, the district court held that lack of "ownership" to be fatal to Plaintiffs' lawsuit.

For purposes of analyzing the availability of the bonds' sovereign-immunity and other waivers, however, we think the question is not whether Plaintiffs "own" the bonds but whether they may sue to enforce them. Moreover, we hold that, although we have discretion under Federal Rule of Civil Procedure 44.1 to decide the relevant question of Argentine law in the first instance, we also have discretion to remand so that the district court — which is better situated in these circumstances to implement Rule 44.1's flexible procedures for determining foreign law — may do so. Furthermore, we do not think the district court's reliance on the doctrine of adjudicative international comity as an alternative ground for dismissal was appropriate in these circumstances. We therefore vacate the district court's judgment dismissing Plaintiffs' damages claim. Finally, we affirm the district court's dismissal of Plaintiffs' claim for injunctive relief.

## BACKGROUND

This case involves the Republic of Argentina's 1994 bond issuance and was prompted, like many others, by Argentina's 2001 default on those bonds and moratorium on subsequent payments. Plaintiffs held approximately $36 million worth of those bonds bearing maturity dates in 2012 and 2017, but prior to Argentina's default, Plaintiffs entered their bonds into a complex governmental tax-credit program that has given rise to the disputes at issue in this appeal. On August 9, 2001, Argentina's then-President issued a Presidential Decree establishing a program (the "Tax Credit Program") that allowed bondholders to obtain tax credits in place of interest payments on their bonds. In short, the bondholders would place their bonds into trust and would receive two types of certificates: Tax Credit Certificates (or "CCFs," as abbreviated in the original Spanish), each corresponding to the bonds' outstanding interest payments, and Custody Certificates (or "CCs"), which corresponded to the bonds' outstanding principal. Once in possession of those certificates, the bondholders could redeem the CCFs as each interest payment came due for a credit against their tax obligations. The precise role and legal status of the CCs in this program, by contrast, is among the disputed issues in this case.

4

In November 2001, just prior to Argentina's default, Plaintiffs entered the Tax Credit Program and deposited their bonds into trust. Argentina stopped making interest and principal payments on the bonds in December 2001 and has not made such a payment since. Nevertheless, Plaintiffs have been able to redeem their CCFs for tax credits in the amount of each pre-maturity interest payment as it came due. The relevant bonds have now reached (and passed) their maturity dates, and Plaintiffs have redeemed all of their CCFs. Argentina has not repaid the principal due at maturity, however, and still refuses to do so.

After Plaintiffs' 2012 bonds reached maturity and Argentina did not repay their full principal amount, one Plaintiff — Euclides Bugliotti — brought a so-called *amparo* proceeding in Argentine court seeking a declaration that Argentina's postponement of its payment obligations was unconstitutional under Argentine law. In that lawsuit, Bugliotti sought an order "suspending the effectiveness" of any regulation "that suspends or restricts [Bugliotti's] right to collect on the Custody Certificates." J. App'x 148. That lawsuit is ongoing.

Plaintiffs' remaining bonds matured in 2017 and Argentina again failed to repay the principal due. Plaintiffs then filed this lawsuit seeking a money

5

judgment in the amount of unpaid principal and post-maturity interest and an injunction enforcing the bonds' *pari passu* clause.

The district court dismissed Plaintiffs' complaint, reasoning that Plaintiffs' participation in the Tax Credit Program — whereby Plaintiffs deposited their bonds into trust and received CCs and CCFs — had effected an "exchange" of Plaintiffs' bonds for the CCs and CCFs, such that Plaintiffs no longer "own[ed]" the bonds themselves, despite being beneficiaries of the trusts in which they were held. *Bugliotti v. Republic of Argentina*, No. 17-CV-9934 (LAP), 2019 WL 586091, at *2 (S.D.N.Y. Jan. 15, 2019).[1] That meant that Plaintiffs could no longer avail themselves of Argentina's sovereign-immunity waiver and consents to service of process and personal jurisdiction, both contractual features of the bonds but not of the CCs, the only instruments that Plaintiffs still retained. *Id.* at *3. The district court alternatively held that, under the doctrine of "adjudicative" international comity, abstention was appropriate in deference to the pending *amparo* proceeding in Argentina. *Id.*

---

[1]      Unless otherwise indicated, in quoting cases all citations, alterations, emphases, footnotes, and internal quotation marks are omitted.

## STANDARD OF REVIEW

We review *de novo* the dismissal of a complaint for lack of personal and subject-matter jurisdiction, and for failure to state a claim, accepting the complaint's well-pleaded allegations as true. *Washington v. Barr*, 925 F.3d 109, 113 (2d Cir. 2019); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). And we review dismissals on the ground of adjudicative comity for abuse of discretion. *In re Picard*, 917 F.3d 85, 101 (2d Cir. 2019), *petition for cert. filed*, No. 19-277 (U.S. Aug. 30, 2019).

## DISCUSSION

On appeal, Plaintiffs argue that the district court's focus on the abstract, undifferentiated concept of bond "ownership" was misplaced, and that the relevant questions concern whether the bonds remain a live obligation of the Argentine government and, if so, who may bring suit to enforce them, including to recover the unpaid principal. We agree. The record as it comes to us on this motion to dismiss reflects that the bonds remain in existence and, we infer, remain a live obligation of the Argentine government. While we need not (and do not) opine about to whom that obligation may run, we conclude that the district court's judgment of dismissal was appropriate only if Plaintiffs are not

7

among those entitled to seek a judgment of unpaid principal and post-maturity interest, whether that judgment would properly be in Plaintiffs' own name or in the name of another — for example, in the name of the relevant trusts or their trustee.

Whether Plaintiffs are entitled to sue to enforce the bonds is a question of Argentine law, specifically a matter of interpreting the governing trust documents and the legal background against which they were executed. Because the district court did not focus on this question, we remand so that it may do so.

While we undoubtedly have discretion to decide this question of Argentine law in the first instance and would not be limited to the record created in the district court were we to do so, *see Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998), we conclude that the circumstances of this case call for a different allocation of judicial resources. Questions of foreign law are decided in the federal courts pursuant to Federal Rule of Civil Procedure 44.1, which provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Adopted in 1966, the Rule "fundamentally changed the mode of determining foreign law in

federal courts" from a common-law regime that treated the meaning of foreign law as a question of fact. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1873 (2018). To be sure, the "'obvious' purpose" of Rule 44.1 was "'to make the process of determining alien law identical with the method of ascertaining domestic law to the extent that it is possible to do so,'" and thus, among other things, to free appellate courts from the strictures of clear-error review of a closed factual record made in the district court from the parties' own submissions. *Id.* (quoting 9A Wright & Miller, Federal Practice and Procedure § 2444, at 338-342 (3d ed. 2008)). At the same time, however, Rule 44.1 preserves a district court's freedom to employ fact-like procedures, including by taking written and oral testimony, as sometimes may be required to adjudicate foreign legal questions. Rule 44.1 thus simultaneously requires law-like appellate review of foreign-law determinations, while maintaining a district court's flexibility to tailor fact-like methods of inquiry to the needs of the case.

As an appellate court, Rule 44.1 invests us with the same discretion to look beyond the record and the parties' submissions as it affords the district courts. *Curley*, 153 F.3d at 12; *see* Arthur R. Miller, *Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine*, 65 MICH.

L. REV. 613, 691 (1967). And we may even determine foreign law in the first

instance in appropriate circumstances. *Curley*, 153 F.3d at 12; *see* Miller, 65 MICH.

L. REV. at 692 ("Abandonment of the fact theory of foreign law vitiates any

justification for an absolute rule that alien law initially be determined by a trier

of fact."). But because these legal determinations frequently call for fact-like

procedures that a district court is better situated to implement, considerations of

judicial economy will occasionally lead us to remand rather than review a

foreign legal question with which the district court did not, or did not fully,

engage. Because that may be the case here, we will allow the district court to

conduct the necessary inquiry into Argentine law in the first instance.

In doing so, the district court is of course not limited to the materials

submitted by the parties in connection with Argentina's motion to dismiss.

Rather, the district court should "invoke the flexible provisions of Rule 44.1" and

must avoid a determination that rests "simply on the basis of an inadequate

submission by one party." *Id.* at 13.[2] The district court's task, in other words, is to

arrive at an independent interpretation of the governing Argentine law, aided by

---

[2]     For this reason, the district court's reliance on its view that Plaintiffs had "not advanced any compelling arguments against [Attorney General Frias's] restatement of Argentine law" was an insufficient basis to conclude that the Attorney General Frias's characterization of Argentine law was correct. *See Bugliotti*, 2019 WL 586091, at *3.

the most persuasive (or, as the case may be, authoritative) materials available to it. We note, in that regard, that a decision by an Argentine court as to the meaning of the relevant Argentine laws may be preferable to any of the materials proffered thus far in this litigation.[3] In the absence of an authoritative answer to a foreign legal question, however, a district court's obligation to reach an independent determination remains.

We reiterate that we express no view as to whether, under the governing trust agreements and background Argentine law, Plaintiffs retained a right to bring a lawsuit to recover the bonds' unpaid principal. We emphasize, however, that many possible arrangements are conceivable. Whether the terms of the trust could, or did, reserve or deny to Plaintiffs the right to bring such a lawsuit is a question that might yield different answers under different legal regimes. We will accordingly remand so that the district court may decide in the first instance how best to answer that question in this case.

---

[3]    In arriving at its interpretation of Argentine law as to who "owns" the bonds, the district court relied primarily on the declaration of the Argentine Attorney General. *Bugliotti*, 2019 WL 586091, at *3. We express no view as to the appropriate weight to be given to that opinion in these circumstances, but we note that "a federal court is neither bound to adopt [a] foreign government's characterization" of its own laws "nor required to ignore other relevant materials. When a foreign government . . . , as here, offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission." *Animal Sci. Prods*, 138 S. Ct. at 1873.

The district court also concluded, in the alternative, that dismissal was appropriate under the doctrine of "adjudicative" international comity, which permits abstention in deference to parallel foreign proceedings in exceptional circumstances. "The general rule," however, "is that concurrent proceedings regarding the same question are tolerated." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 191 (2d Cir. 2018). As we have explained:

> [W]hatever factors weigh in favor of abstention, only the clearest of justifications will warrant dismissal. The task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction. The exceptional circumstances that would support such a surrender must, of course, raise considerations which are not generally present as a result of parallel litigation, otherwise the routine would be considered exceptional, and a district court's unflagging obligation to exercise its jurisdiction would become merely a polite request.

*Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006). Thus, even to the extent the Argentine *amparo* proceeding is parallel to this one — a question we have no need to address — abstention on the grounds of adjudicative international comity would be appropriate only upon a "clear justification" supported by considerations which are "not generally present as a result of parallel litigation." *Id.* The district court cited "the

12

importance of the Tax Credit Program to the Republic" and Argentina's "greater interest" in the litigation, *Bugliotti*, 2019 WL 586091, at *3, considerations that would be present in virtually every case implicating an important foreign governmental program. But we have singled out only one type of foreign governmental program — namely, foreign bankruptcy regimes — as categorically sufficient to trigger comity-based abstention. *See Royal & Sun*, 466 F.3d at 92-93. Because the district court "did not identify any exceptional circumstances that would support abstention" in this case, *id.* at 94, its decision to abstain was an abuse of discretion.[4]

We therefore vacate the district court's judgment dismissing Plaintiffs' damages claim. We affirm, however, the district court's dismissal of Plaintiffs' claim for injunctive relief to enforce the bonds' *pari passu* clause. As we have previously explained, mere selectivity in payment among FAA bondholders is not enough to give rise to a *pari passu* violation, which has in the past required us to conclude that Argentina was a "uniquely recalcitrant debtor." *Bison Bee LLC v. Republic of Argentina*, 778 F. App'x 72, 73 (2d Cir. 2019) (summary order). Plaintiffs have not alleged facts sufficient to disturb our more recent conclusion

---

[4]     We express no view as to whether abstention might be appropriate based upon other considerations, or on a more developed record.

that "Argentina is 'uniquely recalcitrant' no more." *Id.* Nor have Plaintiffs

persuaded us that, despite this insufficiency, they should be permitted to

maintain their *pari passu* claim in the hope of supporting it with better evidence

in the future. If new events occur or new facts emerge that suggest an entitlement

to injunctive relief, Plaintiffs may pursue such relief through amendment or by

filing a new action, subject to the ordinary rules of civil procedure.

## CONCLUSION

For the reasons stated and to the extent set forth above, the judgment of

the district court is AFFIRMED in part and VACATED in part, and the case is

REMANDED for further proceedings not inconsistent with this Opinion.