22-424-cv(L)
*The branch of Citibank, N.A., established in the Republic of Argentina v. De Nevares*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2022

(Argued:  March 16, 2023     Decided:  July 12, 2023)

Docket Nos. 22-424-cv, 22-1083-cv

———————

THE BRANCH OF CITIBANK, N.A., ESTABLISHED IN THE REPUBLIC OF ARGENTINA,

*Petitioner-Appellee,*

*v.*

ALEJANDRO DE NEVARES,

*Respondent-Appellant.*[1]

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————

Before:     LEVAL, CHIN, and LEE, *Circuit Judges.*

———————

---

[1]      The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Appeals from various orders of the United States District Court for the Southern District of New York (Marrero, *J.*).  Respondent-appellant is a former employee who won a judgment in Argentina's National Court of Labor Appeals against Citibank, N.A.  Petitioner-appellee, the Argentinian branch of Citibank, N.A., filed a demand for arbitration with the American Arbitration Association and brought the proceedings below.  The district court compelled arbitration, preliminarily enjoined the employee from enforcing the Argentinian judgment against petitioner-appellee, and held respondent-appellant in contempt of court.  It also denied his motion to dismiss.  We conclude that the district court lacked subject matter jurisdiction over this action because the Argentinian branch did not establish that it has legal existence separate from Citibank, N.A., and because Citibank, N.A., did not seek to substitute itself for the branch as the real party in interest.

REVERSED AND REMANDED.

ROBERT L. SILLS (Ryan R. Adelsperger, *on the brief*), Pillsbury Winthrop Shaw Pittman LLP, New York, NY, *for Petitioner-Appellee*.

GARY TRACHTEN (David N. Saponara, *on the brief*), Kudman Trachten Aloe Posner LLP, New York, NY, *for Respondent-Appellant*.

2

CHIN, *Circuit Judge*:

In this case, respondent-appellant Alejandro De Nevares obtained a judgment (the "Argentinian Judgment") in the Republic of Argentina against his former employer, Citibank, N.A. ("Citibank"). Petitioner-appellee -- "The branch of Citibank, N.A., established in the Republic of Argentina" (the "Branch") -- brought this action below to compel arbitration and enjoin De Nevares from taking steps to enforce the Argentinian Judgment against the Branch. The district court ruled in favor of the Branch. We hold that the Branch has not carried its burden of demonstrating that it enjoys separate legal existence from the corporate entity, Citibank. Although Citibank is the real party in interest, it did not seek to substitute itself for the Branch. Because this action has therefore lacked adverse parties, it has not presented a case or controversy within the jurisdiction of the federal courts, as established by Article III of the U.S. Constitution. The district court therefore did not have subject matter jurisdiction. We REVERSE the district court's orders and REMAND with instructions to dismiss for want of jurisdiction.

## STATEMENT OF THE CASE

**I.    *The Facts***

The parties generally do not contest the facts underlying their dispute.  De Nevares, an Argentinian citizen, began working at the Branch, which is located in Buenos Aires, in 1992.  In 1994, he was transferred from the Branch to Citicorp Capital Markets, S.A., also in Buenos Aires.  In connection with that transfer, De Nevares did not execute a resignation or release.  In 2003, Citibank offered De Nevares a transfer to a position in its New York office, where he would work as a "Vice President, Level U" within the Emerging Markets Sales and Trading group.  J. App'x at 96.  The position was to begin in January 2004.  De Nevares accepted the transfer and, in accordance with company policy, resigned his position with Citicorp Capital Markets, S.A.  He also executed a release stating, in relevant part, that (1) the Branch and "Citibank, N.A[.,] New York Branch" are different employers and (2) he would not have legal recourse against the Branch for any damages related to his employment in New York.  *Id.* at 101.

Upon starting work in New York, De Nevares signed an employment agreement containing an arbitration clause.  The clause provided, in

4

relevant part, that "all disputes based on legally protected rights . . . that may arise between [De Nevares] and Citigroup Inc. or its parent, affiliates, officers, directors, employees[,] and agents" would be submitted to binding arbitration. *Id.* at 81.[2] De Nevares also acknowledged receipt of Citigroup's employee handbook, which contained an "Employment Arbitration Policy" providing that arbitration is "the required and exclusive forum for the resolution of all employment disputes based on legally protected rights." *Id.* at 109, 486.

In 2007, Citibank terminated De Nevares's employment. It offered him, but he refused, a separation agreement under which, in return for executing a general release of claims against Citibank, he would have been paid the equivalent of approximately fourteen months' salary.

Instead, in 2009, De Nevares sued Citibank in Argentina, alleging that, under Argentinian law, he was entitled to severance pay after he was wrongly refused reinstatement of his employment in Argentina following the termination of his employment in New York. When De Nevares attempted to serve process on the Branch, the Argentinian trial court ruled that only Citibank, and not the Branch, was a party to the case.

---

[2] Citibank is a subsidiary of Citigroup, Inc. ("Citigroup"), a Delaware corporation, and Citicorp Capital Markets, S.A., is an affiliate of Citibank.

5

The proceedings moved slowly. Not until May 2021, twelve years after commencing litigation, did De Nevares prevail in Chamber VIII of the National Court of Labor Appeals (the "Labor Appeals Court"), which, reversing the trial court, concluded that the Branch and Citibank "were a single entity" and that De Nevares's employment agreement with them constituted "a single contract." *Id.* at 230.[3] Moreover, the court held, De Nevares's 2003 resignation and release were invalid because they were a "pretense imposed by the real employer." *Id.* The court issued the Argentinian Judgment and awarded De Nevares an amount originally close to four million U.S. dollars. With fees and interest, by the time Citibank commenced the present action, the amount due under the Argentinian Judgment had risen to some $9.5 million. Under Argentinian law, De Nevares's local counsel and expert translator are entitled to enforce in their own right the portions of the Argentinian Judgment that are due to them -- approximately $1.7 million for his counsel and approximately $450,000 for his expert translator.

---

[3]     All quotations of text originally in Spanish are from the certified English translations included in the parties' Joint Appendix.

## II. *Proceedings Below*

### A. *The Arbitration Demand, Petition to Compel Arbitration, and Temporary Restraining Order*

On July 16, 2021, the Branch filed a Demand for Arbitration with the American Arbitration Association, pursuant to the employment agreement between Citibank and De Nevares. The Branch sought, *inter alia*, declarations that (1) De Nevares's 2003 resignation and release are binding, precluding him from seeking damages from the Branch for alleged injuries arising out of the termination of his employment with Citibank in New York, and (2) any judgment issued against Citibank may not be enforced against the Branch.

The same day, the Branch filed in the Southern District of New York a petition to compel arbitration under De Nevares's agreements with Citibank (the "Petition"). The Branch alleged that "De Nevares is virtually certain to seek enforcement of the [Argentinian J]udgment . . . against [the Branch]" and that he "has manifested an unambiguous intent not to arbitrate with [the Branch]." *Id.* at 17-18. The Branch sought an injunction compelling arbitration and prohibiting De Nevares from initiating or prosecuting litigation or attempting to enforce the Argentinian Judgment against the Branch.

At the same time it filed the Petition, the Branch moved *ex parte* in the district court for a temporary restraining order and an order to show cause why a preliminary injunction should not be entered. The district court held oral argument July 23, 2021, on the request for a temporary restraining order. In a post-argument letter, De Nevares contended that the district court lacked subject matter jurisdiction over the Petition because the Branch does not enjoy legal existence separate from Citibank. The district court entered a temporary restraining order July 31, 2021, prohibiting De Nevares "from enforcing, or attempting to enforce, the [Argentinian] Judgment against [the Branch] or any of its assets." *Id.* at 215. The order specifically restrained De Nevares from arguing that the Branch and Citibank "are not separate entities." *Id.* at 216. The order also provided that "[t]he foregoing restraint does not include any effort to enforce the [Argentinian] Judgment against [Citibank] directly." *Id.*

On August 19, 2021, De Nevares moved in the district court to dismiss the Petition. He argued that (1) the Branch is an illusory party without capacity to sue and, therefore, the district court lacked subject matter jurisdiction; (2) there was no valid arbitration agreement between De Nevares and Citibank; (3) the district court should dismiss the Petition under the doctrine of *forum non*

8

*conveniens*; and (4) the Branch had not met the standard for a preliminary injunction.

On February 13, 2022, the district court entered an order compelling arbitration, granting the Branch's motion for a preliminary injunction, and denying De Nevares's motion to dismiss.

B.   *Subsequent Proceedings in Argentina*

While the temporary restraining order was in force and the parties' motions were pending, De Nevares's Argentinian counsel and expert translator sought to enforce their respective portions of the Argentinian Judgment.  In Argentina, they initiated proceedings to execute against Citibank assets held in an account at the Central Bank of the Argentine Republic.  On October 29, 2021, Citibank moved in Argentina's National Labor Court of First Instance (the "Labor Trial Court") to block execution of those portions of the Argentinian Judgment, contending that the funds in question belonged to the Branch, not Citibank.

On November 1, 2021, the Labor Trial Court ruled that De Nevares's counsel and expert translator were entitled to execute against Citibank in Argentina.  Because the court's ruling was ambiguous as to whether the Branch and Citibank are separate entities, De Nevares's Argentinian counsel filed a

"Request for Clarification" before the Labor Trial Court.  The Labor Trial Court transferred the request to the Labor Appeals Court, over Citibank's objection.  De Nevares joined the Request for Clarification as a nominal party, on his Argentinian counsel's advice that he would risk prejudice to his interests if he did not do so.

In response to the Request for Clarification, on December 15, 2021, the Labor Appeals Court ruled that, "[f]or the appellant's peace of mind and in order to avoid conflicts in the enforcement of the claim as to who is obliged to pay the fees of [De Nevares's] counsel," the Branch and Citibank "were a single bank."  *Id.* at 735.  The court therefore "uph[eld] the appeals filed by [De Nevares's] counsel and the expert translator in order and scope of the terms of the final judgment rendered . . . on the sentence of payment of CITIBANK NA."  *Id.* at 736.

C.    *The Contempt Proceedings*

As these events were unfolding, the Branch filed a letter in the district court requesting a pre-motion conference in anticipation of a motion to hold De Nevares in civil contempt.  The Branch argued that De Nevares violated the temporary restraining order by joining the Request for Clarification.  De

10

Nevares responded that the temporary restraining order, which barred him from attempting to enforce the Argentinian Judgment against the Branch, did not enjoin him from entering a nominal appearance in an action by other parties against an account titled in the name of Citibank.

On December 17, 2021, without seeking further briefing, the district court held a conference and entered an order holding De Nevares in civil contempt and directing him to withdraw his appearance in the Request for Clarification. The court gave De Nevares until December 21 to do so; it ordered that beginning December 22, he would be fined at least $10,000 per day until he purged his contempt. Although the district court entered its contempt order after the Labor Appeals Court had ruled in De Nevares's favor on the Request for Clarification, De Nevares successfully withdrew his Argentinian appearance and did not incur any fine. When the Labor Appeals Court accepted De Nevares's withdrawal, it also rejected Citibank's application to reconsider its December 15 ruling.

The Branch moved in the district court on February 15, 2022, for an award of approximately $85,700 in attorneys' fees and approximately $3,000 in costs associated with the contempt motion. The Branch argued that the amount

11

of its request was justified because its counsel had spent substantial time preparing a full contempt motion which it did not file because the district court held De Nevares in contempt based on the parties' letter briefs and oral argument. On May 3, 2022, the district court awarded the Branch the full amount of fees and costs it sought. *Branch of Citibank, N.A., established in the Republic of Argentina v. De Nevares*, No. 21-CV-6125, 2022 WL 1315587 (S.D.N.Y. May 3, 2022).

De Nevares filed three notices of appeal, on March 2, March 16, and May 12, 2022.[4]

***DISCUSSION***

We begin with our own jurisdiction. The Branch contends that under the Federal Arbitration Act's provisions concerning appeals, this Court lacks appellate jurisdiction over the district court's orders compelling arbitration,

---

[4]     Although the Branch argues that De Nevares's notice of appeal as to the contempt order was untimely, it does not dispute that De Nevares's notice of appeal as to the district court's order compelling arbitration and entering a preliminary injunction was timely. Subject to exceptions not relevant in this case, an interlocutory contempt order generally merges with and becomes subject to appellate review alongside the district court's final disposition of an action. *See Anobile v. Pelligrino*, 303 F.3d 107, 115 (2d Cir. 2002) ("[T]his Court interprets an appeal from a specific order disposing of the case as an appeal from the final judgment, which incorporates all previous interlocutory judgments in that case and permits their review on appeal.").

12

holding De Nevares in contempt, and awarding attorneys' fees. *See* 9 U.S.C. § 16.

We need not reach this question, however, because the Branch does not contest

that we have appellate jurisdiction over the preliminary injunction. *See* 28 U.S.C.

§ 1292(a)(1). Therefore, we have appellate jurisdiction to rule on whether this

case is properly before the federal courts under Article III of the U.S.

Constitution. Because (1) the Branch failed to meet its burden to show that, as a

matter of Argentinian law, it is a separate legal entity from Citibank and (2)

Citibank has never sought to substitute itself for the Branch as the real party in

interest, this action lacks adverse parties. For that reason, there was no case or

controversy before the court, as required by Article III, and the district court did

not have subject matter jurisdiction. The case must be dismissed.

**I.**     ***Standards of Review***

We review *de novo* the legal analysis underlying the district court's

decision to deny De Nevares's motion to dismiss under Fed. R. Civ. P. 12(b)(1).

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To the extent that the

district court's analysis rested on its determination of Argentinian law, our

review is also *de novo*. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138

S. Ct. 1865, 1873 (2018); *see also Bugliotti v. Republic of Argentina*, 67 F.4th 102 (2d

13

Cir. 2023). A court determining foreign law "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.[5] We review factual findings underpinning the district court's decision for clear error. *Makarova*, 201 F.3d at 113.

## II.    *Applicable Law*

"The most elemental requirement of adversary litigation is that there be two or more [adverse] parties, meaning that absent a plaintiff with legal existence, there can be no Article III case or controversy." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 384 (2d Cir. 2021), *cert. denied*, 142

---

[5]    "At common law, the content of foreign law relevant to a dispute was treated as a question of fact." *Animal Sci. Prods.*, 138 S. Ct. at 1872 (internal quotation marks omitted). Under Fed. R. Civ. P. 44.1, however, a court's determination of foreign law "must be treated as a ruling on a question of law." Whereas under the common law, "[a]ppellate review was deferential and limited to the record made in the trial court," under Rule 44.1, "[a]ppellate review, as is true of domestic law determinations, is *de novo*." *Animal Sci. Prods.*, 138 S. Ct. at 1873. An appellate court, therefore, may "reexamine and amplify material presented" below or conduct its own research. *See id.* (alteration adopted and citation omitted); *see also Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413-14 (2d Cir. 2020) (explaining that "Rule 44.1 . . . simultaneously requires law-like appellate review of foreign-law determinations, while maintaining a district court's flexibility to tailor fact-like methods of inquiry to the needs of the case"); *Compañía de Inversions Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1296 (10th Cir. 2020); *Palencia v. Perez*, 921 F.3d 1333, 1339 (11th Cir. 2019) ("[I]n performing [appellate] review [of a district court's determination of foreign law] we can conduct our own research of relevant sources.").

14

S. Ct. 757 (2022) (alterations adopted) (citations and internal quotation marks omitted). "The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists." *Doe v. Trump Corp.*, 6 F.4th 400, 415 (2d Cir. 2021) (quoting *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019)). Therefore, when the court's subject matter jurisdiction depends on whether a putative plaintiff enjoys independent legal existence, that party bears the burden of demonstrating, by a preponderance of the evidence, that it in fact exists separately.

Whether a party enjoys separate legal existence may be a decisive issue as to whether federal courts have subject matter jurisdiction over disputes involving that party, but legal existence itself "turns on an examination of" the law of the party's place of incorporation or formation. *Fund Liquidation Holdings*, 991 F.3d at 386.

Unlike in other Circuits, in this Circuit, the absence of an adversary lacking legal existence does not create "an incurable nullity" requiring that a case be dismissed. *Id.* at 386; *see also Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 427 (2d Cir. 2015) (Sack, J., concurring). Instead, we have held, "Article III is satisfied so long as a party with standing to prosecute the

specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time." *Fund Liquidation Holdings*, 991 F.3d at 386.

## III. *Application*

We must first decide whether the Branch has carried its burden of showing that it enjoys separate legal existence under the laws of the Republic of Argentina. We hold that it has not. That takes us to the next question: whether Citibank, the real party in interest, has satisfied the obligation to "ratify, join, or be substituted into the action within a reasonable time." *Fund Liquidation Holdings*, 991 F.3d at 386. Citibank has not sought to join the action as petitioner, and the Branch has stringently denied that it and Citibank are the same entity. Citibank has "fail[ed] to materialize" as the petitioner. *Id.* Therefore, the case lacks adverse parties and does not present an Article III case or controversy. It thus must be dismissed for want of subject matter jurisdiction.

### A. *The Branch's Legal Existence*

The parties do not dispute that whether the Branch enjoys legal existence separate from Citibank is a question of Argentinian law. Argentinian

16

law applies because the Branch was "established" and operates in Argentina and it is the Branch's separate existence that is at issue in this case.[6] The parties disagree, however, as to how Argentinian law treats the Branch.

The evidence concerning Argentinian law before the district court consisted principally of declarations by Nicolás Pertiné, a member of the bar of the city of Buenos Aires and the Branch's general counsel, and Alfredo L. Rovira, also a member of the Buenos Aires bar and a consultant professor of business law at the National University of Buenos Aires's School of Law.

Upon reviewing the foreign-law evidence, the district court concluded, "in its discretion," that the opinion of the Branch's expert, Pertiné, was more persuasive than that of De Nevares's expert, Rovira. *Branch of Citibank, N.A., established in the Republic of Argentina v. De Nevares*, No. 21-CV-6125, 2022 WL 445810, at *5 (S.D.N.Y. Feb. 13, 2022). For this and other reasons, the district court held that "under Argentine law, [the Branch] exists as a legal entity empowered to sue and be sued and therefore has standing to pursue its Petition." *Id.* at *4.

---

[6]  For this reason, we do not decide whether the Branch would enjoy independent legal existence under the law of New York, Citibank's principal place of business.

On *de novo* review of the experts' declarations and related evidence, we conclude that the Branch failed to carry its burden of showing it possesses independent legal existence under Argentinian law.

1.      *Analysis of the Parties' Expert Opinions*

To show that it is legally distinct from Citibank, the Branch relies primarily on Pertiné's declaration, which the Branch appended to its application for the temporary restraining order.  Pertiné's thesis is that, "[a]s a matter of Argentine law, [the Branch] has the capacity to sue and be sued in its own name." J. App'x at 66.  His declaration is brief, less than three full pages long, and its brevity is not a virtue.  Pertiné refers to Argentinian statutes in only a cursory manner; he does not cite any case law or administrative decision.

Pertiné's declaration asserts the following propositions:  (1) the Branch is "registered as a branch of [Citibank] with the Office of Corporations in the city of Buenos Aires," pursuant to Section 118 of the General Corporations Law of Argentina No. 19,550; (2) the Branch "holds a banking license granted by the Central Bank of Argentina . . . which regulates [the Branch] as a separate entity subject to Argentine laws and regulations"; (3) the Branch "is subject to its own local capital and reserve requirements" and must "prepare and submit its

18

own audited financial statements" to the Argentinian central bank, which along with other Argentinian governmental entities has the right to inspect the Branch; (4) the Branch is "individually registered with Argentina's National Securities Commission," which "allows [the Branch] to act as an agent in the local capital markets"; and (5) "[p]ursuant to Law No. 25,738," the Branch "provides notice on its website and in its physical locations that [Citibank] is not liable for the obligations of [the Branch]." *Id.* at 65-66.

Pertiné's statements do not substantiate the declaration's thesis that the Branch has the capacity to sue and be sued. That the Branch is registered *as a branch* does not demonstrate that it may sue or be sued in its own name. That the Branch holds a banking license means simply that the Argentinian central bank has permitted it to engage in banking. That the Branch is regulated and may be inspected by Argentinian authorities, including the central bank, does not mean that Argentinian law deems it an entity that can sue or be sued separately from the foreign bank of which it is a part. As for the fact that the Branch "must prepare its own financial statements," this comes closer as it at least indicates that Argentinian authorities have an interest in knowing the local financial condition of the Branch, as distinct from that of Citibank. Nevertheless, this reporting

19

requirement falls far short of showing that, as a matter of Argentinian law, the Branch can sue or be sued. Finally, the notices the Branch posted pursuant to Law No. 25,738 do not demonstrate that Citibank is not liable for the Branch's obligations. A business corporation that is liable for the obligations of its branches does not escape liability simply by posting signs declaring that it is not liable.

Furthermore, Pertiné's declaration also fails to demonstrate that the Branch enjoys legal existence separate from Citibank. Instead, the declaration refers three times to the Branch as a "branch" of Citibank. *Id.* at 64-65. The Branch may be registered, licensed, regulated, and inspected separately from Citibank; it may act as an agent in Argentinian markets; and it may sue and be sued, without ever being anything more than a branch.

In contrast, Rovira's declaration on behalf of De Nevares is significantly more persuasive, for several independent reasons. Unlike Pertiné, Rovira is not an employee of a party to this case; instead, he is a scholar and legal practitioner with substantial academic credentials. Unlike Pertiné's declaration, Rovira's cites extensively from Argentinian statutes and case law. And unlike

Pertiné's conclusion, Rovira's accords with domestic legal authority concerning the status of the Branch. We address each of these matters in turn.

Rovira's lengthy *curriculum vitae* establishes both his expertise and his independence. He has earned three academic degrees in law, holds a chair in business law in the School of Law at the National University of Buenos Aires, and has served as an arbitrator or expert witness in arbitral and court proceedings, both in Argentina and abroad. In addition to his role at the National University of Buenos Aires, Rovira has recently taught business law on a part-time or visiting basis at four other academic institutions in Argentina and Uruguay. His dozens of publications concern such relevant topics as the enforcement of foreign judgments, foreign equity interests in Argentinian corporations, and the prerequisites for foreign corporations to operate in Argentina. Moreover, although Rovira has been retained by De Nevares as an expert witness, his relationship to this case is less immediate, and the risk of bias in his opinion is correspondingly lower.

As one might expect from a scholar of Rovira's caliber, his declaration is replete with citations to Argentinian statutes, judicial decisions, and academic commentaries. The premise of Rovira's analysis is that, in

Argentinian law, a branch may be "separated from the parent company," but it is not "an entity distinct from the parent company. The branch has a certain juridical autonomy given by the scope of the powers of attorney granted by the parent." *Id.* at 280. Likewise, Rovira opines that a branch "is a unit (*dependencia*) separate from the parent but it is always the same juridical person." *Id.* at 283 n.7.[7]

Rovira cites decisions of Argentinian courts that contradict Pertiné's claims and, moreover, squarely address the question of the Branch's separate legal existence. First, as to Section 118 of Argentina's General Corporations Law No. 19,550, Rovira summarizes decisions of Argentina's Supreme Court of Justice, National Court of Commercial Appeals of the Federal Capital, and National Court of Appeals in Federal and Administrative Litigation of the Federal Capital. The statute, he writes, "provides that the company organized abroad is ruled insofar its existence and format by the laws of the place of incorporation. And, on the other hand, the branch does not have its own personality, thus, it is the same company organized abroad that carries out, in a

---

[7]     Although not dispositive, we note that Rovira's observations accord with the plain meaning of the term "branch," namely, "[a]n offshoot, lateral extension, or division of an institution." *Branch*, Black's Law Dictionary (11th ed. 2019).

decentralized manner a certain activity in our country." *Id.* at 282 n.6. Then, as to the regulatory requirement that Argentinian bank branches must maintain and file separate financial statements, Rovira observes that "the assets and liabilities shown by the financial statements of the branch must be included in the financial statements of its parent because the branch's assets are the parent's assets and the parent is liable for the branch's liabilities and obligations"; for this proposition, he cites a decision of the National Court of Commercial Appeals. *Id.* at 283 & n.7. Moreover, as to Law No. 25,738, which Rovira notes was enacted to ensure that foreign banks would continue doing business in Argentina following a domestic financial crisis, he comments that the statute and its implementing regulations limit branches' liability for their parents' activities *only* as to "local Argentine banking transactions," not as to "other transactions or obligations of [a] different nature," such as the Argentinian Judgment. *Id.* at 284-85; *see also id.* at 316.

Most squarely on point is Rovira's analysis of a 2009 case involving Citibank. *See id.* at 281 n.4 (discussing Cámara Nacional de Apelaciones en lo Comercial [National Court of Commercial Appeals], 19/11/2009, "In re Equity Trust (Company) Argentina SA c. Zavala, Horacio Raúl," LL Online: AR/JUR/57701/2009). In that case, a plaintiff sued a defendant claiming

23

entitlement to payment of a promissory note the defendant had issued in favor of "*Citibank NA, Sucursal Buenos Aires*" ("Citibank[,] N[.]A[.,] Buenos Aires Branch"), which "Citibank NA" later endorsed in the plaintiff's favor. *Id.* The defendant moved to dismiss on the basis that Citibank could not legally endorse a promissory note payable to *Citibank NA, Sucursal Buenos Aires*, because the two were distinct legal entities. *Id.* The National Court of Commercial Appeals held that there are "no diverse juridical persons among the parent and its branches since in all cases it is the same juridical person, the branch being just a separate unit of the same parent." *Id.* "Furthermore," the court continued, "the branch's net worth belongs to the parent and as a consequence thereof the parent must bear the branch's obligations . . . ." *Id.* Thus, Rovira concludes, the court "expressly rule[d] that Citibank N.A. and its Argentine branch [are] one single entity, dismissing the allegation that the parent and its Argentina branch could be treated as separate and distinct juridical persons." *Id.* at 281.[8]

The statutes, regulations, and decisions Rovira cites weigh strongly against the hypothesis that, under Argentinian law, the Branch enjoys legal existence independent of Citibank. Critically, Rovira's declaration is the only

---

[8]    Moreover, although Rovira's declaration does not cite the decision, the Labor Appeals Court in this case ruled that the Branch and Citibank are not distinct entities.

expert testimony the district court had that actually presents sources of Argentinian decisional law, and Argentinian courts applying Argentinian law have held that the Branch is "just a separate unit of [its] same parent," Citibank, and not a separate legal person. *See In re Equity Trust*, *supra* (*cited in* J. App'x at 281 n.4).

Although Argentinian law controls this issue, we observe that a court in the Southern District of New York has reached the same conclusion as a matter of United States law. In *Aurelius Capital Partners, LP v. Republic of Argentina*, the court decided whether orders of attachment against Argentinian government assets held in accounts at the Branch fell within an exception to immunity under the Foreign Sovereign Immunities Act applicable to the attachment of "property in the United States," 28 U.S.C. § 1610(a). *See* Nos. 07-CV-2715, 07-CV-11327, 07-CV-2693, 09-CV-8757, 09-CV-10620, 2010 WL 768874, at *1 (S.D.N.Y. Mar. 5, 2010). The court observed that the Branch "is registered to do business in Argentina, but is not a separate corporation. It is simply a branch of the United States corporation." *Id.* at *2. The court also commented that "there is no entity known as 'Citibank Argentina' in any legal sense." *Id.* at *3.

For these reasons, we conclude that Rovira's declaration not only rebuts Pertiné's but makes a compelling case that, under Argentinian law, the Branch lacks independent legal existence.

2.    *The District Court's Analysis*

The district court's conclusion to the contrary was erroneous. The district court improperly weighed the foreign-law evidence and incorrectly considered the United States' policy of "strongly favor[ing] resolving disputes by giving effect to valid arbitration agreements." *Branch of Citibank*, 2022 WL 445810, at *5.

As to the parties' submissions concerning Argentinian law, the district court gave little reason for finding Pertiné's declaration more persuasive than Rovira's. Other than citing its "discretion" to credit one party's expert over another's, *id.*, the district court did not address the shortcomings of Pertiné's declaration, nor did it identify any flaw in Rovira's.[9] To the extent the district

---

[9]    The district court erred to the extent it considered its determination of Argentinian law to be a matter of "discretion." *Branch of Citibank*, 2022 WL 445810, at *5. Instead, the district court's task was to weigh the foreign-law evidence, conduct its own research if necessary, and reach a legal conclusion. *See, e.g.*, *Animal Sci. Prods.*, 138 S. Ct. at 1872-73. Moreover, the district court was not in a better position than we are to assess the experts' credibility, because the district court did not hold a hearing and based its decision on written declarations.

26

court addressed the substance of Rovira's analysis, it distinguished the *Equity Trust* case, in which the National Court of Commercial Appeals expressly held that the Branch and Citibank are a single entity, on the ground that that case involved a promissory note rather than an arbitration agreement. "As is the case under United States domestic law, Argentine law may treat branches as separate entities under certain circumstances," the district court observed, but it gave no reason why the answer to the question of the Branch's separate existence should be any different with respect to a promissory note, or why the *Equity Trust* court's holding is otherwise not applicable here. *Id.* at *4. Indeed, as De Nevares's counsel pointed out at oral argument, both a promissory note and an arbitration agreement are contracts.

Moreover, the district court commented that, in reaching its determination of Argentinian law, it gave significant weight to the fact that "at the core of this action is a valid arbitration agreement that applies to this dispute." *Id.* at *5 (footnote omitted). Citing the United States' policy of favoring arbitration, the district court observed that "[t]his policy also counsels in favor of not dismissing this action at this stage." *Id.* While the district court's statement of U.S. law was not inaccurate, the district court's task was, as it recognized, to

27

reach a determination under "the law under which the corporation was organized," here, "Argentin[ian] law." *Id*. Thus, it was error for the district court to take U.S. policy in this respect into account.

For these reasons, we conclude that the district court erred and that the Branch did not meet its burden of showing that, under Argentinian law, it is a legal entity separate from Citibank.[10]

## B.      *Citibank's Status in This Case*

In *Fund Liquidation Holdings*, we reaffirmed the basic principle that a plaintiff without legal existence cannot have Article III standing; we also addressed the possibility that, where a named plaintiff lacks legal existence, the real party in interest might be able to join the action in the named plaintiff's stead. *See* 991 F.3d at 386. *Fund Liquidation Holdings* arose after two Cayman Islands investment funds, representing a class of similarly situated investors, purported to sue dozens of banks over an alleged scheme to manipulate interest rates. *Id.* at 375. When suit was filed, however, the putative plaintiff funds had

---

[10]      We reach this conclusion notwithstanding the fact that documents De Nevares executed at the time he took up his position with Citibank in New York stated that the Branch is a "different employer" from "Citibank, N.A[.,] New York Branch." J. App'x at 101. "[L]ack of federal jurisdiction cannot be waived or overcome by an agreement of the parties." *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934).

been dissolved, and the banks subsequently discovered that "the case was actually being prosecuted by a separate entity, Fund Liquidation Holdings LLC, which assert[ed] that it was assigned the dissolved entities' claims." *Id.* After the district court had decided motions to dismiss, the plaintiffs moved under Fed. R. Civ. P. 17(a)(3) to substitute Fund Liquidation Holdings for the dissolved funds. *Id.* at 377.[11] The district court found that the dissolved funds had fully assigned their interests to Fund Liquidation Holdings and, therefore, granted the motion to substitute. *Id.*; *see also FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-CV-5263, 2018 WL 4830087, at \*11-\*12 (S.D.N.Y. Oct. 4, 2018).

We held that the Cayman funds lacked standing, *see Fund Liquidation Holdings*, 991 F.3d at 384, and we expressly rejected the proposition that "corporate existence has no valence apart from the issue of corporate capacity to sue," *id.* at 382 (alterations adopted) (citation and internal quotation marks omitted). Instead, we held that Fund Liquidation Holdings had standing to sue because

---

[11] Federal Rule of Civil Procedure 17 requires, in pertinent part, that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). Nevertheless, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." *Id.* 17(a)(3).

> Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time.

*Id.* at 386.

We have not yet applied *Fund Liquidation Holdings* to another case involving a party lacking legal existence. *See Nastasi & Assocs. v. Bloomberg, L.P.*, 843 F. App'x 413, 414 (2d Cir. 2021) (summary order) (remanding for reconsideration in light of *Fund Liquidation Holdings* where a named plaintiff had assigned its claims to another party).

Applying *Fund Liquidation Holdings*, we conclude that because the Branch has not shown it is an independent legal entity, Citibank is the real party in interest. Citibank is the entity with which De Nevares signed his employment and arbitration agreements; it is the entity that terminated De Nevares's employment, giving rise to his Argentinian cause of action; it is the judgment debtor in Argentina; and it is the entity against which De Nevares's Argentinian counsel and expert translator sought to enforce their portions of the Argentinian Judgment. Moreover, Citibank would have had Article III standing to file the Petition at the time the Petition was filed in the Branch's name: Citibank would

30

be injured by any attempt by De Nevares to execute the Argentinian Judgment, that injury would be fairly traceable to De Nevares's conduct, and the injury could be redressed by the relief requested in the Petition. *See, e.g.*, *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016).

Unlike Fund Liquidation Holdings, however, Citibank has not moved to substitute itself into this action. Far from it: The Branch's theory of the case, from the first few pages of the Petition onward, has fundamentally been premised on the claim that Citibank and the Branch are distinct entities. *See, e.g.*, J. App'x at 17, 42, 72-73, 338-39, 427-32, 632-38, 649-50, 748. This has also been Citibank's fundamental premise in the Argentinian litigation. Accepting Citibank's premise, when the district court issued its temporary restraining order, it expressly prohibited De Nevares from making "any effort to enforce the [Argentinian] Judgment against [the Branch] or any of its assets based on the claim that [the Branch] and [Citibank] are not separate entities for such purposes." *Id.* at 216. At oral argument, the Branch continued to take the position that it and Citibank are distinct entities.[12]

---

[12]    *See* Oral Argument at, *e.g.*, 23:28-41, 24:10-40, *Branch of Citibank, N.A. v. De Nevares*, Nos. 22-424, 22-1803 (Mar. 16, 2023), https://www.ca2.uscourts.gov/decisions/isysquery/0ff86e44-542b-4471-a8f6-4145087534bc/1/doc/22-424.mp3.

We conclude, therefore, that because the Branch has not shown it enjoys independent legal existence and Citibank has not sought to substitute itself or join this action as the real party in interest, there has been no party adverse to De Nevares. Without adverse parties, there can be no subject matter jurisdiction under Article III. *See, e.g.*, *In re 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016) ("There is no plaintiff with standing if there is no plaintiff."); *see also* 13 Wright & Miller, *Federal Practice & Procedure* § 3530 (3d ed. 2023) ("The most elemental requirement of adversary litigation is that there be two or more parties.").

## *CONCLUSION*

For the foregoing reasons, we hold that the district court lacked subject matter jurisdiction over the Petition. Therefore, the district court was without authority to issue its orders in this case. The district court's orders -- including its order to compel arbitration, the preliminary injunction it entered against De Nevares, its order finding De Nevares in contempt, and its order requiring De Nevares to pay the Branch's attorneys' fees and costs -- are therefore REVERSED. The case is REMANDED with instructions to dismiss for want of jurisdiction.